All rise. Illinois Appellate Court 50 Business Hour Session. I'm Justice Stuart B. Thomas presiding. Good morning. Have a seat, please. Thank you. Mary? Case number 13-2046, Keegle v. Irving Brown, Bowen. All right. Could we have counsel who are going to present and approach the podium and identify yourselves, please? My name is Todd McKenry, and I represent Mr. Harvey Bowen. Assistant State's Attorney Brian Wilkens here for the people. Thank you very much. All right. We'll start with 50 minutes per side. And the appellant, you may reserve time for rebuttal if you wish. May it please the Court. As I mentioned, my name is Todd McKenry, and I represent Mr. Harvey Bowen. With the Court's permission, I'd like to reserve two minutes for rebuttal. Of the issues that have been raised in the opening brief and in the supplemental brief, I'd like to focus on three issues, that being that Harvey Bowen was found guilty of possession of a dangerous weapon in a penal institution based on insufficient evidence, ineffective assistance of counsel, and then furthermore, he was sentenced based on improper aggravating factors. Turning to the sufficiency of the evidence, the prosecution proceeded to trial with essentially two things against Harvey Bowen. The first being the allegations of Officer Ramirez, the correctional officer who was there present when he discovered the item, and then also a photocopy of that item, what appears to be a photocopy of that item. The allegation was that he recovered a 7 1⁄2-inch metallic sharpened piece with a makeshift cloth as a handle. As we've argued and the State appears to concede, to be considered a dangerous weapon under the statute, it has to be capable of cutting. There was no testimony from Ramirez about the degree to which the item was sharpened. Or the manner in which it was sharpened. Furthermore, the photocopy... Let me ask you this. The judge saw a picture of it. Didn't the judge see a picture of it? Correct. And it was something with a jagged edge and it had a sheet as a handle? It has a cloth as a handle. It's the same photo that's been supplemented to the record. And that exhibit shows that it appears to be 3 1⁄2 inches above the handle as the part that may or may not have been sharpened. You could kill somebody with that. Based on looking at it, I can't make that determination. One, you're seeing a side profile of it. You have no idea how thick that piece of metal is. I can't tell that it's jagged. It looks to me like there are some dark marks on it, on the side. The top of it appears to be rounded off. It doesn't appear to be capable of being stabbed. The issue is whether any of the other sides are capable of cutting. Could I ask you, you said that you believe the operative language is cutting and that the state concedes. I'm just wondering, I know that the statute describes certain items that would fit into contraband. And then there's a suggestion of any other dangerous weapon of like, whatever. But I don't recall reading in any cases or really anywhere about this notion that cutting, doesn't it have to be more like dangerous weapon? I don't know where you're getting the cutting from. Well, the statute doesn't define it in one way or another what a knife is or what a razor is or what any of the other examples are. But it does indicate that it's a dangerous weapon. Previously, courts have looked at where the statute does not define what the terms are. It'll look to the common usage and understanding of the term. Isn't shank commonly described as a knife? A homemade knife? A makeshift homemade knife, correct. But to be a knife and to be a dangerous weapon, the item, based on what the definition of in Webster's Dictionary of what a knife is, it's a sharp blade capable of cutting, an instrument capable of cutting. So if an item is in the process of becoming an operative shank that could be capable of cutting someone, the statute doesn't criminalize something that is in the process of becoming a dangerous weapon. It criminalizes the possession of a dangerous weapon. Yes. Doesn't the testimony, though, reflect, I thought the officer described it as a seven to a seven and a half inch blade. Is that what he said? He said seven and a half inch sharpened metallic piece. And he said it was sharpened. It appeared to be sharpened to him. Appeared to be sharpened to him. And if you look at the photograph, the exhibit that was introduced, it does move into the shape where the diameter is wider at the bottom and then as you progress up to the top or the tip of this shank, it's much less. Isn't that correct? Well, two things. I mean, it may be slightly more narrow at the top. But given the, I mean, fortunately there is a ruler that's included in the photocopy. So the actual portion above the handle is only three and a half inches at most. It's not a seven and a half inch blade. So that portion is about three and a half inches. And when you look at the top, the width of most rulers are approximately an inch. That appears to me to be very close to what an inch is. And that's completely rounded. So it's not as if we start from a handle and we get to the point of a dagger or anything like that. So there's no indication based on the photo itself that would lead someone to be able to find beyond a reasonable doubt that this was capable of being used as a dangerous weapon at that time. All right. So you'd like us to write that this is not a dangerous weapon? I'd like the court to find that the state has the burden to prove sufficient facts. Had the officer come in, I mean, obviously they could have come in with the item so that the trier of fact had the ability to look at it. That wasn't done. I would say that this court should hold that you need to have something. Had the officer testified that not only was it sharpened, it was sharpened to the point where it could cut, then it's a different case. But that's not what was shown. So the state has the burden to present sufficient evidence, and in this case they failed to do so. Alternatively, moving to the second point that I'd like to address, counsel was ineffective for failing to move to suppress the statement that Mr. Bowen allegedly made. Both parties agree that the primary case on point in this area is House v. Fields, U.S. Supreme Court case from 2012. In Fields, or in House, they found that just because an inmate is in custody doesn't mean that they're necessarily in custody for the purposes of Miranda, and under the facts of that case they held that the defendant was not in custody. However, the court's analysis demands a contrary result here. All right. Do you know of any cases with similar set of facts where they find contraband in a cell where somebody's entitled to Miranda rights? Well, I mean, I don't know a case that... I mean, anywhere in the whole United States. I don't know any post-House cases that do, but if we look at what House held, which is a fairly recent case, it held that one of the operative concerns is, I mean, it's based on the totality of the circumstances, so you have to look at, it's not as if, you know, any one case is going to control another case, but under the analysis in House, the first factor that they stressed was that in House, the defendant was told in the beginning, and then it was repeated during the interrogation, that he was free to leave at any point. So that's a key difference between our case. Harvey Bowen was never told that he was free to leave or to discontinue the conversation. He was in handcuffs. He was taken from his cell, and he was told that he or his cellmate could be prosecuted. None of those things happen in House v. Fields. And furthermore, House v. Fields also stresses that the context of, you know, in custody, in an institution, interrogations in that setting are going to be very different than interrogations where you take somebody off the street and put them in a police station. One of the differences being that typically we think of citizens taken into a police station and isolated, we consider that to be fairly coercive, that they don't have access to anybody else. In a prison setting, House makes the point that we have to remember, you know, that being questioned in front of other inmates is likely to be more coercive than if they had pulled the suspect to the side. What case says that? That's House v. Fields in 2012. Where does it say that? It says that, I'll get it for you on rebuttal. All right. Well, in House, though, the Supreme Court said there is no hard and fast rule, and that in that case they actually determined that the Miranda warnings were not required. Absolutely. But in that case, though, I ask you, weren't those facts perhaps more, let's see, I don't know what the word is, but in that situation, that individual is actually removed from the cell, taken to a distinct room where he was questioned with an officer. I mean, don't you think that's more coercive than just a, you know, a minute or less conversation is the way the officer described it immediately after finding the shank? Sure. The U.S. Supreme Court did find those factors to be, I mean, they acknowledge that, yes, taking somebody in and questioning them for five to six hours is a fact that's going to lean towards being coercive. However, they stressed he was told he could leave up front, he was told he could leave during it. How do you tell an inmate he can leave up front? They did. How can you? How can you tell an inmate that's just been taken out for a routine administrative search and you've recovered contraband, how can you tell him up front, well, you can leave any time you want? They could tell him you're free to go back in the cell if you want to. Well, actually, they would have to put him back in the cell. He's not free to go back into the cell. He has to be put into that cell, doesn't he? Well, that's how they do it. They don't let people put themselves back. They actually have to put them in. I'm just saying I think that here we have like a minute or two, or actually less than a minute. What about the car case the state relies on? Do you find that something we should even look to? I don't find that case or the great bodily harm case that they turn to to be supportive of their argument. In those cases, I mean, this case is a pure possession case. This is not a case, you know, oh, I'm sorry. That's another section of the argument, but no, I don't. I mean, this setting should be controlled by House v. Fields. That's the one that's on point in a prison institution. And in that case, even though the interrogation was long, there they brought him away from the cell and they told him you can go back on your own accord to the cell. They noted that that was the first factor that led them to believe that he was not actually in custody for the purposes of Miranda. Also, he was not threatened or physically restrained. In our case, he was physically restrained and he was also, Mr. Bowen was threatened with prosecution. Those are three factors that the court explicitly relied upon in House v. Fields and they suggested different results in our case. Don't you have to kind of give us something more than physically restrained when you have an inmate in jail who's already physically restrained? How was his custodial status changed here? Well, I mean, he certainly, he wasn't in handcuffs, presumably, when he was just sitting in his own cell or sleeping. So he was, as part of the search, part of that process, he was handcuffed. So that wouldn't be necessarily just what is normal or what he's going to be expected to be in that condition all day long. So it certainly does change the authoritative structure of what's going on. And again, the officer elected to interrogate him right next to the only other suspect in this crime. I mean, that is a coercive fact where... Well, isn't that one of the questions, whether this is interrogation or not? Is that something we're actually facing here? Correct, but that is one of the factors that goes into whether or not you're in custody, the degree to which the coercive environment helps to determine whether or not you are actually in custody. So in that case, those factors aren't separate from that analysis. And in this case, when you've got the only other person who could have possessed that shank that was hidden under plastic trays, and that person's right next to you as you're being questioned, that's clearly the sort of coercion that the House case was talking about when they said that in a prison institution and you're interrogating somebody in front of others, you have to recognize that that's likely more coercive than it is to take him in a one-on-one situation like they did in House. Neither side discusses the Illinois Supreme Court case, People v. Patterson, 1992. Is there some reason? Do you think that that's just not a relevant or material case that we should be looking at, or what? As it wasn't brought up, I'm not familiar with that case, so I can't comment on it. Well, that was an Illinois prison case. Shank recovered. The defendant was being questioned after the fact by a prison official to find out whether or not the reason for the shank was for his sort of protection because one of the obligations is to make sure that the inmates are safe from, you know, other inmates. But in that case, the Illinois Supreme Court said that the Miranda warnings were not required. He was removed. He was questioned about why he had the shank. So I just wondered. It does say that he wasn't entitled to Miranda warnings in that particular case. Yeah, it would appear that that's the controlling case. Well, I mean, I can't speak to the state's view of whether that's applicable. Our position is that House v. Fields in 2012 should control the case, again, based on all the factors that we've argued with respect to how Miranda should be applied, I believe that that case would be controlling also. What about that Cervantes case? Did the state cite that one? I think they did. I'm not sure, but I thought they did. That was another, I think that was a shank involved on the scene. Well, maybe not. I don't believe that they cited it or argued that this was factually similar to any other case other than House v. Fields. They did argue that that did apply. So for those reasons, certainly the question was after a threat of prosecution and it was intended to elicit incriminating information about who possessed the shank. So for those reasons, a motion would have been meritorious. And furthermore, based on counsel's, as defense counsel acknowledged, this was a statement-only case, so there certainly would have been a reasonable probability of a different outcome absent that statement. They did cite a Cervantes case, but it's not the federal case. Not the one? No, it's a different state case. So then moving to the final point, and that's just the sentencing issue. There were two improper aggravating factors that were relied upon by the sentencing court, the first being conduct that was inherent in the offense. The trial court specifically noted that the 7-inch sharpened shank in the cell, I find it to be aggravating. Obviously the crime itself as charged was the possession of a sharp metallic object as a dangerous weapon, and it was charged, the offense requires that it be in a penal institution. So certainly that conduct, it's not appropriate to rely upon that in aggravation, and the sentencing court did. Furthermore, the court- Can't the court take into account the nature of the object? Having a weapon in a penal institution, the weapon is inherent in the offense, but what about the nature of the weapon? Because there are all kinds of different weapons, and when the judge uses descriptive language and says a sharpened 7-inch shank, doesn't that indicate that he's considering the nature of the weapon? He was looking at the nature of the weapon. However, as we argued before, I don't believe there's sufficient evidence that it was even capable of cutting under the statute, therefore not even a dangerous weapon. So to say that this was somehow more egregious than any other type of knife that would have been recovered, this is a 3-1⁄2-inch blade at best. There's no showing that this was wielded in a threatening manner or anything. This is a straight possession case, and this would be precisely what the legislature would have been doing when it classified it as a Class I offense. There are other items that are contraband that are not classified as Class I offenses that wouldn't require a sentencing range as severe as this one. But this one has a range of 4 to 15 years, and the court acknowledged significant mitigating factors such as a supportive family, good upbringing, good employment history, lack of any gang affiliation, lack of any chemical dependency or drug use, alcohol use. So for those reasons, the court said there's a lot of good in here and there's some bad because he has two prior convictions, and then turned to the aggravating factors. But this sentence is fairly close to the minimum of the range, isn't it? It's two years above, which may seem to be close to the minimum, but the court certainly had the minimum in mind where it said I can't give you the minimum either because you were awaiting charges in jail at the time that you did this. So again, and that's another improper factor. The crime is that you're in a penal institution, so the courts rely on the fact that, well, you were in jail at the time this happened. Again, that's part of the offense. And or if the judge was considering that to be that you were, as he said, that you were on charges for murder, Mr. Bone was acquitted of that. It's, of course, improper to find somebody to increase the sentence based on an offense for which the defendant was acquitted. But didn't she specifically say that she was aware he hadn't been convicted of murder, he had eventually been found guilty of aggravated battery with a dangerous weapon? I'm not sure what the precise charge was, but didn't she say that in her finding that she was aware he hadn't been convicted of murder, but he was awaiting trial? Correct. But then it goes back to the point. If it's not taken that way, then it must mean the fact that he was in prison at the time awaiting trial, and that goes into, again, this offense could not have been completed unless the person was in a penitentiary, in jail or in a prison. So again, it would have been then just a fact inherent in the offense itself. For those reasons, in concluding, the state presented insufficient evidence that Mr. Bone possessed a dangerous weapon, trial counsel was ineffective for failing to suppress the statement, and that the sentence should be remanded for resentencing based on improper aggravating factors. We ask this court to remedy those errors accordingly. Thank you. Thank you, counsel. Steve? May it please the Court again, my name is Brian Levitsky, Assistant State's Attorney on behalf of the people. What does Special Assistant State's Attorney mean? It's on the cover of the brief. You did? Yeah. Although I didn't do it in as polite a manner. I said, what's so special about you, remember that? I do remember that very much. Could you answer Justice Brey's question? Yes. Returning to the Court's first question today, I was a Special Assistant State's Attorney pursuant to a fellowship I was doing with the State's Attorney's Office. I was sworn in yesterday. Congratulations. Congratulations. The guys at the office, I'm no longer special. My grandmother would be here if she would like to pay for it. Okay, thank you. Without further ado, I'm going to address the issues that the defendant raised in his argument, but if the Court would like to ask questions about any of the other issues, I would be happy to answer them. First, the defendant says that the evidence against him was insufficient to sustain this conviction. When, in this case, Officer Ramirez went into the defendant's cell and found near the defendant's possessions in a sack of styrofoam trays, what he testified was a large metallic piece shaped like a knife, or what we commonly refer to as a shank. No one ever testified that this wasn't a knife. There wasn't any evidence to suggest that it wasn't. And the defendant, in this court, has some interchange about the statute talking about cutting and talking about dangerous, but if we look at the statute, under 31 capital A dash 1.2 C2 Roman numeral V, weapon is defined as any knife, any knife. The legislature clearly intended for a shank like this to be included in the items that a prisoner, like defendant, was prohibited from having in his cell. Is the testimony, though, sufficient if it merely says it was sharpened? And the size of the blade, isn't that about all we have? Oh, and it was metallic. And it was metallic, and there was a handle on it, so that it protected the person who was using it. And we have an additional statement that Officer Ramirez believed the defendant said something to the effect of I was going to use it for my protection. And what we have here was basically a knife. We don't know how sharp it was, because we only have that side profile of it. We don't know the heft, we don't know the weight. That's true, but the legislature was intending the statute to cover a large range of objects, which could be used like a knife in a penal institution, which would put the officers and the other inmates at risk of harm. Do you know why the shank wasn't produced as evidence in the case? I do not personally know, but the photographic copy of it showed what Officer Ramirez found. But the photograph was only from one angle, wasn't it? That's true. And again, if there were other photographs which showed other angles, what we would still be left with at the end of the day was a 7 1⁄2-inch sharpened piece of metal with a handle that falls under the defendant's own definition of a cutting instrument consisting of a sharp blade fastened to a handle as a knife. Clearly what the legislature was intending to pivot with the statute And again, the legislature said any knife. It didn't say particularly dangerous knife. It said any knife for this very reason. Again, there wasn't any testimony suggesting the defendant wasn't in constructive possession of this. He had the intention and capability to maintain control and dominion over this knife, which was found in a stack near his possessions, which would have been within his reach at the time that Officer Ramirez came into the cell. The defendant was on the bottom bunk. His cellmate was on the top bunk. So the defendant wasn't in constructive possession of this, and he admitted to it, and he explained why he had it. The evidence in this case proved beyond reasonable doubt that the defendant was in possession of a knife under the statute. Turning to the ineffective assistance claim, it's the defendant's burden to establish both grounds of the Strickland test, of course. And here, counsel wasn't ineffective for failing to make what had been a meritless objection or motion. The defendant was not in Miranda custody at the time that he was asked the question. And the case that is analogous to this is People v. Haviland, which we discussed in our brief. The Carr case? The Carr case. Didn't come up with any shame cases? I regret that we didn't cite People v. Patterson in this court. Well, did you find any other cases regarding the possession of a shank where the question came up about whether or not an inmate would be entitled to Miranda warnings immediately after the discovery of the shank? I didn't come up with any cases like that. And, I mean, it's because, in this case, what we have was on-the-scene investigation where the Miranda warnings wouldn't be required in order to introduce a statement. And in Haviland, we had what was really an identical fact pattern, except for the fact that it was outside of a judge. Well, but you didn't have somebody in custody, and they were already in a penal institution, and then they were removed for an administrative search, and then he's handcuffed. What about counsel's suggestion that that was coercive and that his custodial status had changed because it went from a cell where he's not handcuffed to outside the cell where he's actually handcuffed, and he's being questioned when he's handcuffed? I mean, that all happened before there was any knowledge on an officer for Miranda's part that there was even contravening. Right, but then at some point, he's being questioned. Right. And the factors surrounding this shakedown of the cell were just ordinary incidents of prison life for the defendant. The only thing that happened after Officer Ramirez found the chain... Is he asking some questions? Is he said, who is this? The defendant didn't say anything at that point. Didn't he tell him that either both of you are going to go down for this one because it's in the cell? He did say something to that effect. Isn't that coercive? It's one factor. But when we're looking at Miranda custody, we have to look at all the factors. And that factor is, again, to bring it back to Havlin, we had a case where an officer found contraband. He approached individuals. He presented it to them, drugs, narcotics, and paraphernalia, and said, whose is this? And the defendant in that case admitted to it. And so what we have is what the court found in that case was that there wasn't Miranda custody. And, again, in this case it was the same thing. Officer Ramirez approached the defendant. He had the shank. He said, whose is this? What about counsel's argument that he's amidst other inmates? Is that coercive? He was surrounded by other inmates, including his cellmate. And... Is that coercive, or is it the opposite? We don't know everything about the interaction between the defendant and his cellmate. It could have been a factor in familiarity that would have helped the defendant feel that he was in a calm setting. But I don't believe that the record really gives us enough to talk about that. More certainly. And when we look at the case that the defendant keeps referring to, Howze vs. Field, it wasn't just the fact that the officer told the defendant that he could leave. In that case, the Supreme Court continually stressed that the officers were asking the defendant about a crime that was outside the prison. This is a case where the defendant is asked about a contraband that is immediately found, and Officer Ramirez is going through a routine shakedown of the defendant's cell. And so Kavelin is the more analogous case to Howze vs. Field's. Let me ask you this. Instead of interrogating him outside the cell, they took him into a room and interrogated him. Would that make a difference? Well, in Howze vs. Field's, the defendant was taken into a room, and the Supreme Court in that case found that the defendant was not in Miranda custody. And so it would appear under Supreme Court jurisprudence that that would not be a factor in suggesting Miranda custody. And even if the defendant could establish this prong of strickling, again, it's the defendant's burden to establish both prongs, there is no reasonable probability that the outcome would have been different in this case. During the Krankel inquiry, the trial court specifically addressed this and found that the defendant was still in constructive possession, said that, I would have made that finding even if she didn't have the benefit of the defendant's statement. What do we do with the attorney's statements that he said it would have been prudent to have filed a motion, and he also said it was a trial strategy not to file a motion? Right. Strickland talks about an objective standard and eschews looking back at these issues in hindsight. After the issue was raised, trial counsel said, maybe I should have done this. He did say that, didn't he? He did say that. And it was more than maybe I should have done this. Yes, that's correct. He said that in hindsight he should have. But we're looking at this as an objective standard from what trial counsel knew at the time. And again, even if it was a trial strategy, that relates back to the prong of objective reasonableness. Even if the defendant could mean that, either because it was a trial strategy or because it wasn't objectively reasonable, there's still no reasonable probability that the outcome would have been different in this case. Wouldn't your argument be better just that they didn't satisfy the second prong? Our argument is that he didn't satisfy either prong, and the defendant has to establish both prongs in order to make his claim of ineffective assistance. Well, you don't think that a good lawyer would have made a motion to suppress? In this case, again, where the defendant wasn't in Miranda custody, that would have been a futile motion. And it's well settled that trial counsel is not going to be found ineffective where he makes a futile motion. He fails to make a futile motion. I'm sorry? He won't be ineffective when he fails to make a futile motion. That's right. And any motion in this case, again, in light of Haviland, would have been futile, and Howes v. Fields doesn't change my analysis. If there are no further questions on that issue, I would like to turn to the two sentencing factors. The defendant first points to where the trial court said, the 7-inch sharpened shank in the cell I found to be aggravating. And Justice Palmer, as you pointed out, this was a discussion of the particular shank that was found. The statute doesn't prohibit only 7-inch shanks of a particular sharpness. It says any knife. So if the trial court was merely commenting on the particular shank that was found in this case and any error that the trial court may have committed was harmless beyond a reasonable doubt where the trial court explicitly said it was concerned with deterrence in this case, which is a statutory factor in aggravation. And the defendant's sentence was 6 years and a Class 1 offense, which had a range of 4 to 15. So where there's another proper factor that was considered by the trial court, the defendant's sentence would have done the same. The defendant orpheted his argument that the trial court considered the charge for which he was acquitted of. First, there wasn't an error here. We have to read the trial court's comments as a whole. What the trial court said first was, I'm not considering any of the arrests that were not found guilty. Later on, the trial court commented, you were awaiting trial on a murder charge when you were found with a shank. Even though you weren't convicted of that charge, you were awaiting trial for that charge when you were found with a shank, and that's somewhat aggravating. And the trial court wasn't referring to any of the facts which may have been in that case. It was referring to the fact that the defendant was awaiting trial, and someone who's awaiting a murder trial would be in pretrial custody for presumably a long time. So that creates an additional risk that the defendant's possession of the shank would create. Even if it was a clear, obvious error in this case, the evidence of the defendant's sentencing hearing wasn't closely balanced. The defendant said that there was a lot of good and a lot of bad. It was some good, some bad. And again, the trial court was explicitly concerned with the deterrence, concerned with his background, which included two convictions for aggravated battery with a firearm and unlawful use of a weapon. And so the defendant couldn't meet his burden under the first prompt. There wasn't any structural error in this case. The Supreme Court has never said that the consideration of a factor like this would be second-prompt plenary. Therefore, the defendant forfeited this issue. There wasn't any clear or obvious error. And if there was, the defendant can be acquitted under the plenary test. And if there are no further questions, the people would respectfully ask this Court to affirm the defendant's conviction and sentence and modify the size of his order. Thank you. Thank you, Counsel. Just three brief points. The first being that we seem to have a disagreement as to what constitutes a knife. The opposing counsel relies on the fact that, well, it just says any knife in the statute, so therefore any knife must qualify. Again, since it's not defined within the statute, you look to the dictionary, the dictionary says it's got to be a sharp object capable of cutting. There's been no testimony that this was a sharp object capable of cutting. Well, I would say one thing on that. Black's Law Dictionary actually defines shank as well. And under Black's, a shank is a pointed or sharp-edged weapon, usually a dagger or knife that is usually either homemade or made by a prisoner. So they don't use this cutting notion. And again, but it uses sharp. I would say that the inference from that is that it's capable of cutting if it's sharp. There was no testimony that this one was actually capable of cutting sharpened to that point. The second point I'd like to make is, you know, this idea that counsel maintained that we simply can't tell whether or not it would have been coercive to be questioned in front of the only other suspect in the crime. You know, and presuming that this is an object that's going to be intended to become a dangerous weapon at some point, certainly I think we can assume and House would also, I think, support this view where it says that, you know, inmates are not necessarily friends and if somebody, if there's discovered a shank and you're questioned and you're said, you're told, you and the other guy can both be prosecuted for this. So don't come on. Somebody start talking. Obviously that is a coercive factor under House and under common sense. Finally, at the sentencing hearing, to maintain that this was not closely balanced is untenable based on the fact that the court specifically said, I find this, you know, there's some good here, there's some bad here, and then expressly talked about two improper aggravating factors and said that the second of which, that he was in custody at the time awaiting murder trial, that that is, that that meant that the court could not impose the minimum. So the minimum was clearly in mind, this was a closely balanced case and accordingly any error was plain error. Thank you. All right. Thank you, counsel. All right. The court thanks all the parties for their excellent briefing and their arguments today and we will take the matter under advisement. Court is adjourned. Thank you very much.